

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ENTERED
09/10/2009

| | | |
|---|---|---|
| **IN RE:** | § | **Case No. 02-39553** |
| **IFS FINANCIAL CORPORATION,** | § | |
| Debtor(s). | § | **Chapter 7** |
| | § | |
| | § | **Adversary No. 04-03745** |
| **W. STEVE SMITH, TRUSTEE,** | § | **Adversary No. 04-03757** |
| Plaintiff(s) | § | **Adversary No. 04-03768** |
| | § | **Adversary No. 04-03775** |
| **VS.** | § | **Adversary No. 04-03803** |
| | § | |
| **RAMON GARCIA SUAREZ,** | § | **Judge Isgur** |
| Defendant(s). | § | |

## <u>MEMORANDUM OPINION</u>

The Court awards judgments against Guillermo de la Pena Stettner, Luis de la Pena, Margarita Isabel de la Pena Stettner, Cristina de la Pena Stettner, Paz de la Pena Stettner and Mario Valverde Garces arising out of avoidable fraudulent conveyances received by them. The Court denies all claims against all other defendants. The Court's principal findings are as follows:

- The funds were paid out of an account legally titled in the name "Integra Bank," but actually owned and controlled by the Interamericas Companies.

- IFS, acting through its officers and agents, exercised exclusive control over the account.

- The funds were paid on account of antecedent debt, but in furtherance of a fraudulent scheme.

- The judgment defendants knew or should have known of the fraudulent scheme.

### Summary

The Interamericas Companies were comprised of operating businesses offering insurance, mortgage, and banking services along with affiliated holding companies and off-shore

investment vehicles.  IFS Financial Corporation ("IFS") was the holding company that held the income producing subsidiaries.  IFS was the nucleus of the Interamericas Companies.

The Interamericas Companies were funded largely through Mexican investors.  Mexican investors were issued debt instruments (typically CDs from a Curacao, Netherlands Antilles bank or bearer notes in the name of an Interamericas Companies entity) at above market rates.  The security of the investments depended on the success of the Interamericas Companies entities.  At least by 1998, the Interamericas Companies were no longer operating as a viable enterprise.  The only assets with significant value were liquidated, while millions of dollars in new investor debt continued to be incurred.  Proceeds from the liquidations and newly invested funds from Mexican investors were paid to insiders or favored investors.

In this adversary proceeding, Trustee Smith seeks to recover approximately $3 million in payments made to a small group of investors during the Interamericas Companies' final years.  Trustee Smith brings his claims on behalf of the IFS estate only.   To succeed on his claims, Trustee Smith must prove that: (1) the withdrawals were property of IFS; and (2) IFS made the transfers with the intent to hinder, delay, or defraud creditors.

The identity of the true owner of the transferred funds is obscured by the "circuitry of arrangement"[1] amongst the Interamericas Companies.  Investor funds were deposited in an account at the Southwest Bank of Texas styled in the name of Integra Bank.  Integra Bank was incorporated in Curacao and was not technically owned by an Interamericas Companies entity.  Nevertheless, the evidence demonstrated that IFS controlled the Southwest Bank of Texas account to such an extent that IFS was the true owner of the account.  IFS used the Southwest Bank of Texas account as its general fund.  IFS transferred proceeds from the sales of IFS businesses into the account.  IFS paid IFS shareholder dividends and IFS business expenses from

---

[1] *Dean v. Davis*, 242 U.S. 438, 443, 37 S. Ct. 130 (1917).

the account.  All transfers to and from the account were approved by board members operating on behalf of IFS.  Integra Bank could not unilaterally withdraw funds from the Southwest Bank of Texas account.

Based on the evidence presented and as set forth in greater detail later in this Memorandum Opinion, the Court concludes that the Interamericas Companies controlled the Southwest Bank of Texas account to such an extent that Interamericas was the true account owner, notwithstanding legal title in another party.

IFS's intent to hinder, delay, and defraud was evidenced by the condition of its enterprise.  When the transfers were made, IFS: (1) had sold or was in the process of selling its only legitimate operating businesses, and (2) IFS continued to borrow money in a Ponzi-like scheme[2] from new investors.  Even if IFS began as a legitimate enterprise, IFS's officers eventually concluded that it had no hope of honoring its commitments to investors.  IFS orchestrated a series of fraudulent inter-company loans to distort its balance sheets and solicited new investments to pay-off old investments.  By 1998, IFS's transfers were made solely to keep the fraudulent scheme going.  Under Supreme Court and Fifth Circuit precedent, the existence of a pervasive fraudulent scheme is sufficient to find fraudulent intent with respect to transfers made in furtherance of that scheme.

As set forth in detail below, Trustee Smith established the necessary elements of a fraudulent transfer claim.  Though most investments were made in good faith, the distributions were not.  With the exception of three Defendants who have established an affirmative defense, the Court will award judgments against Defendants and in favor of the IFS estate.

---

[2] Ponzi schemes are generally defined as schemes in which "fictitious profits are paid to investors from the principal sums deposited by subsequent investors." *Floyd v. Shindler (In re Rodriguez)*, 204 B.R. 510, 513 (citing *Cunningham v. Brown*, 265 U.S. 1, 44 S. Ct. 424, 68 L. Ed. 873 (1924)).

**Background**

*1. The Interamericas Companies*

The IFS Financial Corporation ("IFS") bankruptcy case is a jointly administered case comprised of approximately 19 related entities (the "Interamericas Companies"). The Interamericas Companies included Interamericas, Ltd., Interamericas Investments, Ltd., Interamericas Holdings, Inc., Interamericas Corporation, Interamericas Financial Holdings, Ltd., Interamericas Financial Holdings Corp., IFS, and other related entities. The Interamericas entities included holding companies that simply held stock in other entities, off-shore shell companies created to channel money to and from investors, and actual operating entities. The operating entities were involved in the mortgage, banking, insurance, real estate, custom brokerage and transport forwarding, money exchange, construction/development, and food industries.

The Interamericas Companies can be broken into two branches. One branch of entities was owned under holding companies bearing the word "Interamericas." A second branch of entities was owned under holding companies bearing the word "Financial." IFS was in the Financial branch. IFS held Interamericas Companies' most significant businesses: American Founders Life Insurance Company ("AFL"),[3] AccuBanc Mortgage Corporation ("Accubanc"), and Pueblo Corporation ("Pueblo"). AFL was an insurance company, Accubanc was a subprime mortgage originator, and Pueblo focused on selling various products to the Latin American community. Though a few smaller businesses were owned through the Interamericas branch, AFL, Accubanc, and Pueblo were the primary operating businesses.

---

[3] AFL was formerly called Bradford National Life Insurance Company. For convenience, the Court references the entity only as AFL.

Interamericas Companies received capital primarily from Mexican investors, although there were some European investors as well.  Interamericas Companies paid "promoters" to solicit investors and encourage investors to keep their assets with the enterprise.  Promoters were paid 0.10-1.00% per month of total investments retained by Interamericas Companies.  Investors were sold foreign CDs or bearer notes, both paying rates of approximately 10–11%.  The promoter commission and interest rates were to be paid from the operation of Interamericas Companies' businesses.

Investor funds were sent to Interamericas Companies' Woodlands, Texas headquarters and deposited in a Southwest Bank of Texas account held in the name of Integra Bank.[4]  Integra Bank was the primary off-shore entity used to channel foreign investor funds into Interamericas Companies entities.  Integra Bank was incorporated in Curacao, Netherlands Antilles, and, at least on paper, was independent of the Interamericas Companies.  Investors' account statements would list the individual's investments and the account balance.  Investments were listed as either: CDs in the name of Integra Bank or bearer notes issued by an Interamericas Companies entity.  Investors were told that their investments were in safe CDs issued by Integra Bank.  Representations made by promoters and Advisory Board members and the account statements led investors to believe that their money was in fact deposited with Integra Bank.  Though some investors understood that their CD rates of return were earned by Integra Bank's investments in

---

[4] The Interamericas Companies held four different accounts that were used for investor deposits and managing Interamericas Companies entities.  In addition to the Southwest Bank of Texas account in the name of Integra, the Interamericas Companies had two accounts in the name of INV entities.  One INV account was at the Southwest Bank of Texas.  The other was at Woodforest National Bank.  Both were in Woodlands, Texas.  The Interamericas Companies also had a Delaware account.  However, the Southwest Bank of Texas account in the name of Integra was the primary account used.  The majority of funds at issue came from the account in the name of Integra.  To the extent disputed transfers came from an INV account, the same analysis applies.  The dominant issue is whether IFS controlled the accounts to the extent that IFS rather than Integra or INV was the true owner.  The same evidence regarding IFS's control applies equally to the INV accounts.  Accordingly, to avoid confusion, the Court refers to all accounts as the Southwest Bank of Texas account.

Interamericas Companies, investors nevertheless assumed that their CD accounts were held and managed by Integra Bank.

Though all the Interamericas Companies had separate corporate existences, incorporated in countries around the world, all were controlled by a single Advisory Board based in the Woodlands, Texas.[5]   The Advisory Board's membership changed from time to time, but was primarily dominated by the Pimienta family (Hugo, Enrique, and Arturo), Rodolfo Garcia, Peter Ulrich, and Ramon Beteta.  Hugo Pimienta effectively ruled the Advisory Board during much of the time period between 1998 and Interamericas Companies' demise in 2002.  The Advisory Board set interest rates on the CDs and bearer notes.  The Advisory Board controlled how investor funds would be invested in the various Interamericas Companies entities.  The Advisory Board controlled what Interamericas Companies would be sold and for how much.  The Advisory Board directed loans between the Interamericas Companies when the Board determined that a company needed increased capitalization.  To the extent that Interamericas Companies and Integra Bank had officers and directors that were not part of the Advisory Board, they were not independent of the Advisory Board.  No one disregarded orders from the Advisory Board.  When the Advisory Board was not meeting, its authority was delegated to Hugo Pimienta and fully exercised by him.

At least by 1998, the Advisory Board, largely though Hugo Pimienta, controlled the Southwest Bank of Texas account.  Virtually all transactions relating to the Interamericas Companies were processed through the Southwest Bank of Texas account.  Hugo Pimienta approved all withdrawals from the Southwest Bank of Texas account. No one at Integra Bank had independent authority to authorize withdrawals from the Southwest Bank of Texas account.

---

[5] The Court limits its determination that all Interamericas Entities were effectively controlled by the Advisory Board to the period between 1998 and IFS's bankruptcy case in 2002.  Only the period 1998 forward is relevant for the purposes of this adversary proceeding.

The Interamericas Companies began to crumble after a failed merger with a group of investors led by Jorge Hollander under the name of Blitz.[6]  In late 1997 or early 1998, the Interamericas Companies joined with Blitz.  Soon thereafter, Jorge Hollander and the Advisory Board developed differences in investment philosophy.  Blitz demanded a split and obtained an approximately $50 million note from Interamericas Financial Holdings Corporation.  At some point before the original note became due, the parties restructured their deal.

Under the restructured deal, Interamericas Financial Holdings Corporation and IFS were required to meet and maintain certain financial ratios.  In May of 2000, the parties executed a Commercial Loan Agreement restructuring the debt.  Under the agreement, IFS took on the debt obligation and issued a new note to Blitz in an amount of over $70 million.  After IFS defaulted under the Commercial Loan Agreement, Blitz instituted various lawsuits.  Prior to 2001, IFS paid approximately $30 million to Blitz on account of the notes.

Between 1998–2000, IFS attempted to pay-off the Blitz obligations, meet Blitz's financial ratios, and honor obligations to old investors through the continued solicitation of new investors, fraudulent inter-company loans, and the sale of its few profitable businesses: AFL and Accubanc.

In 1998, AFL lent approximately $40 million to Interamericas Companies' investors.  The evidence suggests that individual investors (or shell companies created for investors) signed the notes to AFL but did not receive any proceeds from the loans.  At most, investors received a broker-entry credit on their investment account statements.  Loan proceeds went to IFS.  Investors did not make payments on the loans.  The Trustee refers to these loans as the "Select

---

[6] Hollander's group went by the name of GCM, but Hollander ultimately obtained a note and judgment against IFS in the name of company called Blitz.  Blitz was a subsidiary of GCM.  For convenience, the Court makes no distinction between GCM and Blitz and refers to both as Blitz.

Asset Loans."  The purpose of the loans was to funnel cash out of AFL and into IFS, while allowing AFL's balance sheet to reflect obligations from the credit-worthy Mexican investors.

In late 1999–2000, IFS sold AFL and Accubanc.  AFL was sold for approximately $49 million and Accubanc was sold for approximately $40 million.  All sales proceeds passed through holding companies into IFS.  A portion of the proceeds was used for payments on the Select Asset Loans (to maintain the false impression that the Select Asset Loans were bona fide), while the majority of funds were deposited in the Southwest Bank of Texas account.

While the Blitz litigation was ongoing, between 1998 and 2000, the Advisory Board transferred substantially all funds out of the Southwest Bank of Texas account to insiders and investors.  During this same period, the Advisory Board engineered the sale or transfer of most, if not all, the operating entities under the Interamericas family in an attempt to mollify some of IFS's creditors and artificially keep the enterprise in business.

Under the jointly administered case, W. Steve Smith, Trustee, has filed over 100 adversary proceedings to recover unpaid balances on the Select Asset Loans and direct transfers from the Southwest Bank of Texas account.  Most of the adversary proceedings were filed against individual investors who received withdrawals from the Southwest Bank of Texas account while IFS was not operating as a legitimate enterprise.  The allegedly fraudulent transfers received by defendant investors often amounted to a small portion of the total amounts invested by them (and ultimately lost) with the Interamericas Companies.

### 2. The Fraudulent Transfer Adversary

On October 8, 2004,[7] Trustee Smith filed this adversary proceeding against Ramon

---

[7] All Trustee Smith's claims fall within the statute of limitations.  An involuntary petition was filed for IFS on August 23, 2002.  However, the order for relief was not issued until October 11, 2002.  Section 546 provides that an action under § 544 must be brought with "2 year after the entry of the order for relief . . ." 11 U.S.C. § 546. Trustee

Garcia Suarez, Guillermo de la Pena Stettner, Woodberry #2, Mario Valverde Garces, Luis de la Pena, Margarita Isabel de la Pena Stettner, Maria Cristina de la Pena, and Maria Paz de la Pena.[8] Trustee Smith seeks recovery of approximately $3 million, in the aggregate, from Defendants based on direct transfers from the Southwest Bank of Texas account.  Trustee Smith also asserts additional claims against defendant Luis de la Pena for an alleged unpaid debt of $5,500,000.00 owed to Interamericas Companies entity and alleged dividends paid by IFS to Luis de la Pena as an IFS stockholder.

Trustee Smith asserts essentially the same allegations against all Defendants.  Trustee Smith alleges that, in response to the Blitz separation, the Advisory Board began transferring all of IFS's assets to insiders, including Defendants.  Trustee Smith alleges that proceeds from asset sales were transferred to the Southwest Bank of Texas account and then to Defendants.  Trustee Smith seeks to recover the alleged fraudulent transfers pursuant to § 544 of the Bankruptcy Code, and §§ 24.005 and 24.006 of the Texas Business and Commerce Code.[9]

Trial of the adversary began on July 18, 2007.  On July 19, 2007, the Court continued the trial to allow Defendants additional discovery of the accounting system used by IFS, the Portia System.  Trial resumed on January 5, 2009 and continued through January 9.  Two more trial

---

Smiths' claims are based on § 544 and all adversaries considered in this Memorandum Opinion were filed on either October 8, 9, or 10, 2004.

[8] Trustee Smith originally filed separate adversary proceedings against Defendants.  On April 21, 2006, the Court issued a Scheduling Order providing that the separate adversary proceedings would be tried jointly.  The April 2006 scheduling order also included adversaries 04-03756, 04-03812, and 04-03858 for joint trial.  Adversary 04-03756 was settled and the Court entered an Agreed Order dismissing the case on January 9, 2008.  On September 8, 2008, the Court issued a Case Management Order severing the latter adversaries for separate trials due to the deaths of the named defendants.

[9] Defendants allege that Trustee Smith's claims are barred by judicial estoppel based on Trustee's admissions regarding Blitz's role in the Interamericas Companies demise.  Defendants allege that in prior lawsuits, Trustee Smith admitted that the Blitz promissory note triggered Interamericas Companies collapse.  Assuming Trustee Smith made these admissions, they are irrelevant to Trustee Smith's claims under § 24.005(a)(1) of the Texas Business and Commerce Code.  As set forth in greater detail later in this Memorandum Opinion, under 24.005(a)(1), the relevant inquiry is the intent of the transferor, not the cause of insolvency.

days were held on January 30 and February 25, 2009.  Parties made closing arguments on June 3, 2009, and submitted post-trial briefing shortly thereafter.

For the reasons set forth below, the Court finds that the direct transfers from the Southwest Bank of Texas account to members of the de la Pena family were fraudulent transfers and awards separate judgments against these defendants individually and in favor of the IFS estate.  The Court dismisses all claims against Ramon Garcia Suarez, Mario Valverde Garces (except for one $2,000.00 transfer), and Woodberry #2, and certain claims against Luis de la Pena.

### Jurisdiction

This Court has jurisdiction of this matter under 28 U.S.C. § 1334.  This is a core matter under 28 U.S.C. § 157(b).  Venue is proper in this District pursuant to 28 U.S.C. §1409.

### Fraudulent Transfer Claims

Section 544(b)(1) allows a trustee to avoid transfers that a creditor could avoid under applicable state law. 11 U.S.C. § 544(b)(1); *ASARCO LLC v. Americas Mining Corp.*, 404 B.R. 150, 156 (S.D. Tex. 2009) ("Trustees and debtors in possession use § 544(b) as a conduit to assert state-law-based fraudulent-transfer claims in bankruptcy.").

Section 544(b)(1) provides: "Except as provided in paragraph (2), the trustee may avoid any transfer of ***an interest of the debtor in property*** or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title." 11 U.S.C. § 544(b) (emphasis added).  Accordingly, to succeed on a § 544(b)(1) claim, Trustee Smith must establish three elements: (1) the transferred property was an "interest of the debtor;" (2) the transfer is voidable under applicable state law; and (3) a creditor holding an allowable unsecured

10

claim could bring the state law avoidance action. Trustee Smith bears the burden of establishing the alleged fraudulent transfers by a preponderance of the evidence. *Jenkins v. Chase Home Mortgage Corp. (In re Maple Mortgage, Inc.)*, 81 F.3d 592 (5th Cir. 1996); *Walker v. Anderson*, 232 S.W. 3d 899, 913 (Tex. App.—Dallas 2007, no pet.); *G.M. Houser, Inc. v. Rogers*, 204 S.W. 3d 836, 842–43 (Tex. App.—Dallas 2006, no pet.).

The Court considers the three elements separately below.

### 1. An Interest of the Debtor

The facts suggest a situation ripe for veil-piercing: by 1998, the Advisory Board, through Hugo Pimienta,[10] directly controlled all Interamericas Companies entities and used the entities for his benefit. If the Court were to make its decision independently of the procedural history and posture, the Court might find that the separate corporate existences of all Interamericas Companies entities and the offshore companies used to channel investor funds should be collapsed. However, Trustee Smith's theory of recovery is *not* based on a veil-piercing theory and the Court declines any relief based on a veil-piercing theory.

Trustee Smith brings this adversary proceeding on behalf of the IFS estate only. Earlier in this adversary proceeding, Trustee Smith sought and obtained an order for joint prosecution of claims from all the consolidated bankruptcy cases. However, Trustee Smith previously filed and dismissed an adversary proceeding alleging that the Court should disregard the separate corporate identifies and view all entities as IFS.[11] In this adversary proceeding, on April 21, 2006, the Court dismissed all claims by entities other than IFS.[12] Trustee Smith filed an

---

[10] Though other members of the Advisory Board also were instrumental in IFS's fraudulent contact between 1998 and 2001, the Court references only Hugo Pimienta. Testimony indicated that Hugo Pimienta was the dominant member of the Advisory Board.

[11] Adversary no. 04-03254, filed March 29, 2004, and dismissed on February 28, 2005.

[12] Docket no. 49, adversary no. 04-03745, issued April 21, 2006.

amended complaint naming only IFS as a plaintiff and Trustee Smith conceded at the April 21, 2006 hearing that he was only asserting claims on behalf of the IFS estate. The Court also dismissed any claims based on an earmarking theory. Accordingly, Trustee Smith has the burden of establishing that the disputed transfers were of IFS property without resorting to veil-piercing, earmarking, or any other abandoned theory.

As discussed earlier, the transfers came from a Southwest Bank of Texas account that *was not* in the name of IFS. The majority of transfers in number and dollar amount came from an account at Southwest Bank of Texas in the Woodlands, Texas, styled in the name of Integra Bank. Defendants allege that the transferred funds were Integra Bank's funds, deposited by Defendants with those companies. Defendants allege that Integra Bank had legal title to the funds and Trustee Smith cannot escape the consequences of that fact without asserting the veil-piercing theory he dismissed.

Independent of any veil piercing theories, Trustee Smith contends that, despite the Integra Bank name on the Southwest Bank of Texas account, IFS *actually owned* the account. Trustee Smith contends that IFS exercised such complete dominion and control over the Southwest Bank of Texas account that, at least by 1998, IFS was the true owner of the account.

The Court is faced with the situation where an account is legally in the name of one entity but effectively controlled by an individual for the benefit of the entities he controls and directs. One of those entities is IFS. The Court considers whether Hugo Pimienta's control over the Southwest Bank of Texas account on behalf of IFS was sufficient to characterize the account as a property interest of IFS's estate, notwithstanding the absence of legal title.

### a. Legal and De Facto Ownership

Pursuant to § 544(b), the Trustee can only recover transfers of "an interest of the debtor

in property." 11 U.S.C. § 544(b). "[T]he purpose of the avoidance provision is to preserve the property includable within the bankruptcy estate" so that all creditors receive the same, equitable, pro rata distribution. *Begier v. I.R.S.*, 496 U.S. 53, 59, 110 S. Ct. 2258, 110 L. Ed. 2d 46 (1990). For the purposes of chapter 5 avoidance provisions, a debtor's interest in property "is best understood as that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings." *Id*. at 58.[13]   Property that would have been part of the estate if not for the transfer is defined by § 541. *Id*. at 58–59.

Section 541(a)(1) defines "property of the estate" as including "all legal or equitable interests of the debtor in property." 11 U.S.C. § 541(a)(1).   Section 541 "is generally interpreted broadly in accordance with the statutory language." *Wilson v. United Sav. of Tex. (In re Missionary Baptist Found. of Am., Inc.)*, 792 F.2d 502, 504 (5th Cir. 1986). While the Bankruptcy Code through § 541 defines what property interests enter the bankruptcy estate, "[t]he nature and extent of the debtor's interest in property is analyzed by reference to the applicable state law." *Id*; *Butner v. U.S.*, 440 U.S. 48, 55, 99 S. Ct. 914, 59 L. Ed. 2d 136 (1979). Accordingly, determining whether a transfer is of "an interest of the debtor in property" involves a two-step analysis: (1) the nature of the debtor's interest in the transferred asset under applicable state property law; and (2) whether the state-law defined property interest becomes "property of the estate" under the Bankruptcy Code.

This Court applies the law of the state with the "dominant contacts" over the disputed funds. *Southmark Corp. v. Grosz (In re Southmark)*, 49 F.3d 1111, 1118 (5th Cir. 1995) (quoting

---

[13] In *Begier*, the Supreme Court interpreted § 547(b) prior to the 1998 amendment that substituted the phrase "an interest of the debtor in property" for "property of the debtor." *Begier*, 496 U.S. at 59 n. 3. However, the Supreme Court noted that both phrases mean "property of the estate" as defined by § 541(a)(1). *Id*. ("We therefore read both the older language ("property of the debtor") and the current language ("an interest of the debtor in property") as coextensive with "interests of the debtor in property" as that term is used in 11 U.S.C. § 541(a)(1) (1988 ed.)." *Id*.

*Tex. Commerce Bank–El Paso, N. A. v. Marsh Media of El Paso (In re Carolin Paxson Adver., Inc.*), 938 F.2d 595, 597 (5th Cir. 1991)).  The accounts were held at Texas banks and controlled by individuals headquartered in the Woodlands, Texas.  There is no question that Texas had the "dominant contacts" with the funds.  No party objects to the application of Texas law.[14]

Defendants are correct that Integra Bank was the legal owner of the Southwest Bank of Texas account.  Integra Bank was a validly incorporated entity.  The Southwest Bank of Texas account was in the name of Integra Bank.  There is no evidence that IFS had a power of attorney or signatory authority on the Southwest Bank of Texas account.  Nevertheless, the Court finds that IFS was the true owner of the Southwest Bank of Texas account.

The legal title owner is not always the true owner. *Silsbee State Bank v. French Mkt. Grocery Co*., 132 S.W. 465, 466 (Tex. 1910); *Cohen v. Ulz (In re Ulz)*, 388 B.R. 865, 868 (Bankr. N.D. Ill. 2008) ("[O]wnership rights in property do not depend solely on formalities of title . . . [a] person may have an interest in property—and may even be considered the owner—although someone else has title.").  The Texas Supreme Court has held that the true owner of funds in an account is not necessarily the legal owner, but the party who "is found in the full possession and control of the money deposited." *Silsbee State Bank*, 132 S.W. at 466. The true owner is not determined by a "legal relation . . . but must be reached by determining the probative force of the facts shown." *Id*.

The Fifth Circuit has also held that the true owner of an account is measured by possession and control rather than bare legal title. *In re Southmark Corp.*, 49 F.3d at 1116–17 (holding that whether the debtor had "unfettered discretion to pay creditors of its own choosing,

---

[14] Neither party suggested that the law of another forum should apply, or, if it did, that the non-Texas law would vary from Texas state law.  "Absent proper invocation of foreign law by pleading and proof, Texas courts presume the foreign law to be the same as Texas law." *In re Enron Corp.*, 2005 WL 6237551, at *n. 33 (Bank. S.D. Tex. Dec. 9, 2005) (quoting 12 TEXAS JUR. 3D *Conflicts of Law* § 8 at 848 (2004) and opinions from Texas courts of appeals.).

including its *own* creditors . . . is . . . the primary consideration in determining if funds are property of the debtor's estate . . .").

The Fifth Circuit explained the distinction by quoting the following passage from a treatise:

> If the debtor determines the disposition of funds from the third party and designates the creditor to be paid, the funds are available for payment to creditors in general and ***the funds are assets of the estate***.  In this event, because the debtor controlled the funds and could have paid them to anyone, the money is treated as having belonged to her for purposes of preference law ***whether or not she actually owns it***.

*Caillouet v. First Bank & Trust (In re Entringer Bakeries, Inc.)*, 548 F.3d 344, 350 (5th Cir. 2008) (quoting 1 DAVID G. EPSTEIN ET AL., BANKRUPTCY § 6–7, at 522 (1992)) (emphasis added).

Although Trustee Smith has abandoned any claims based on the earmarking doctrine, the doctrine nevertheless further demonstrates that legal title is not determinative of true ownership. The earmarking doctrine, recognized by the Fifth Circuit, is based on the concept that control and possession rather than bare legal title determine the true owner.  The earmarking doctrine holds that funds are not property of the estate, even if the debtor held them in an account in the debtor's name, if the funds were intended to be transferred to a non-debtor third party *and* the debtor never exercised control or possession over the funds. *Coral Petroleum, Inc. v. Banque Paribas-London*, 797 F.2d 1351, 1356 (5th Cir. 1986) ("The earmarking doctrine is widely accepted in the bankruptcy courts as a valid defense against a preference claim, primarily because the assets from the third party were never in the control of the debtor and therefore payment of these assets to a creditor in no way diminishes the debtor's estate."). *See also In re Entringer*, 548 F.3d at 349 ("In *Coral Petroleum*, we invoked the 'control' test to determine if a payment was a preference because the money was property of the estate, or if instead the parties

15

'earmarked' the funds for a particular creditor.").

Numerous courts have applied the de facto ownership concept to hold that property of a debtor's estate includes funds that the debtor controlled, despite the fact that another party had legal title to the funds. Judge Brown, in a Ponzi-scheme case, held that an account held in the name of a non-debtor was nevertheless property of the estate because the account was controlled by the debtor. *Floyd v. Shindler (In re Rodriguez)*, 204 B.R. 510, 515 (Bankr. S.D. Tex. 1995). Judge Brown held:

> The sums paid to Shindler were derived from the funds maintained in the commingled bank accounts of debtors except for the payment of $82,151.60 in April 1993. That payment came from the account of T & T Investments at Park National Bank which account was also controlled by Ms. Rodriguez. Shindler submits no summary judgment evidence to controvert the trustee's evidence that the account of debtors and non-debtors including T & T contain commingled investor funds and were under the ultimate custody and control of Ms. Rodriguez. Where the funds transferred are under the custody and control of the debtor "mere circuitry of arrangement will not save a transfer" from being invalid. *Dean v. Davis*, 242 U.S. 438, 443 37 S. Ct. 130, 61 L. Ed. 419 (1917).

*Id. See also Zubrod v. Kelsey (In re Kelsey)*, 270 B.R. 776, 780–81 (10th Cir. B.A.P. 2001) (holding that the entirety of funds withdrawn from a joint account by the debtor were property of the estate even though a third party had legal title to half the withdrawn funds); *In re Ulz*, 388 B.R. at 868 ("A person may have an interest in property—and may even be considered the owner—although someone else has title."); *Barber v. Unionbank (In re Johnson)*, 232 B.R. 735, 739 (Bankr. C.D. Ill. 1999) (holding that "the contract between the bank and the depositor" is not determinative as to the true owner of an account); *In re Estate of Muhammad*, 520 N.E. 2d 795, 797 (Ill. App.—1st Dist. 1987) (holding that "true ownership of a deposit may be proved to be in another than the person in whose name it is made, and courts may use their equitable powers to determine the beneficial or equitable owner of an account").

### i. IFS Was the De Facto Owner of the Southwest Bank of Texas Account

Integra Bank was lawfully incorporated under the laws of Curacao, Netherlands Antilles. On paper, Integra Bank was a lawful Bank independent of the Interamericas Companies. Investors were led to believe that Integra Bank in fact controlled their deposited funds and paid withdrawals upon request.  Investors' account statements listed the individual's investments in Integra CDs or Interamericas' bearer notes, along with the investor's account balances.  The statements indicated that the CDs were issued by Integra Bank.  Representations made by promoters, Advisory Board members, and the account statements led investors to believe that their money (in CDs, at least) was deposited with Integra Bank.  Most investments were made in good faith.  If the transfers at issue came from funds owned by Integra Bank rather than funds owned by the Interamericas Companies Advisory Board, the Court would dismiss Trustee Smith's fraudulent transfer claims.

However, numerous witnesses testified that Integra Bank did not operate as a true bank. Integra Bank utterly lacked all the attributes one normally associates with a true bank.  Integra Bank had a physical structure in Curacao, but it did not have tellers or otherwise appear to be anything more than rented space.  Integra Bank had no significant interactions with its alleged "depositors."  Investors gave their checks or cash to a promoter who in turn forwarded the money to the IFS offices in the Woodlands, Texas.  Integra Bank did not produce its own account statements. Mary Machart, an IFS employee who managed the Portia accounting system that tracked investor deposits and withdrawals, did virtually all the book-keeping from the Woodlands, Texas.  Integra Bank did not set its own rates of return.  Though investor account statements suggested that CDs were held with Integra Bank, multiple witnesses testified that the Advisory Board unilaterally determined all interest rates.

17

Most importantly, the evidence abundantly demonstrated that from 1998 through 2002, Hugo Pimienta controlled the Southwest Bank of Texas account and used it for IFS's benefit. Mary Machart, Jorge Hollander, and Hugo Pimienta all testified that Hugo Pimienta effectively controlled the Southwest Bank of Texas account. The de la Pena Defendants also admitted that Hugo Pimienta controlled the Southwest Bank of Texas account in a complaint they filed against various Advisory Board members in 2006 (the "Montgomery County Litigation").

IFS used the Southwest Bank of Texas account as its general account. Investor deposits were not segregated from other sources of funds. Proceeds from the Accubanc and AFL sales went into the Southwest Bank of Texas account. Investments in Pueblo Corporation and other general operating expenses of Interamericas Companies entities were paid from the Southwest Bank of Texas account. Payments to Blitz came from the Southwest Bank of Texas account. Dividends to IFS shareholders were paid from the Southwest Bank of Texas account.

Hugo Pimienta controlled all investor withdrawals. If an investor wanted to withdraw funds, the investor did not contact Integra Bank. Rather, the investor contacted the Woodlands office of IFS directly or through their promoter. Hugo Pimienta or Rodolfo Garcia had to approve all withdrawals. Though the technical mechanics of executing the withdrawal required an entry by an individual at Curacao, no withdrawals could be executed without Hugo Pimienta or Rodolfo Garcia's authority. No one employed by Integra Bank had independent authority to withdraw money from the Southwest Bank of Texas account.

Trustee Smith produced abundant evidence that Hugo Pimienta exercised unfettered control over the Southwest Bank of Texas account on behalf of IFS. Hugo Pimienta's dominance was sufficient to compel a finding that IFS was the de facto owner of the Southwest Bank of Texas account.

18

### ii. IFS had an Interest in the Entirety of the Southwest Bank of Texas Account

Trustee Smith only asserts claims on behalf of the IFS estate.  Hugo Pimienta managed all the Interamericas Companies entities, not simply IFS.  The evidence demonstrates that the Southwest Bank of Texas account was the general account used by Hugo Pimienta on behalf of the Interamericas Companies enterprise.  Expenses for all entities were paid from the account.  Profits, sale proceeds, and excess cash from all entities were deposited into the account.  There is no evidence of any other accounts through which any Interamericas Companies transferred or deposited significant funds.  Although the Southwest Bank of Texas account was predominantly used by IFS, it was a commingled general account used on behalf of Interamericas Companies as a whole.

The fact that the Southwest Bank of Texas account was a general, commingled account used on behalf of all the Interamericas Companies entities does not diminish IFS's interest in the account.  Control was exercised largely on IFS's behalf.  The majority of funds in the Southwest Bank of Texas account, other than investor funds, came from the sale of AFL and Accubanc.  Both AFL and Accubanc were owned by IFS.  Payments from the account on the Select Asset Loans and Blitz were made on IFS's behalf—IFS was the payee on the note to Blitz and the Select Asset Loans were secured by IFS stock and used to bolster the capital of IFS owned entities.  Dividends paid from the account were paid to IFS shareholders.  After AFL and Accubanc were sold, the Advisory Board concentrated on capitalizing Pueblo Corporation.  Pueblo was owned by IFS.  Though miscellaneous expenditures or revenue related to non-IFS entities may have also passed through the Southwest Bank of Texas account, the vast majority of funds that entered or left the count did so on behalf of IFS.

The Fifth Circuit has held that when a debtor has the ability to pay its creditors from a

general commingled account, the entire account becomes property of the estate. *In re Southmark Corp.*, 49 F.3d at 1116–17. *See also In re Kemp Pac. Fisheries, Inc.*, 16 F.3d 313, 316–17 (9th Cir. 1994) (holding that funds in a commingled account were property of the debtor's estate because the debtor had the "right to withdraw, transfer, or otherwise use the payment funds in any way it wanted"); *In re Bullion Reserve of N. Am.*, 836 F.2d 1214, 1217 (9th Cir. 1988) (holding that funds in a commingled bank account under the debtor's control "presumptively constitutes property of the estate"); *Nordberg v. Sanchez (In re Chase & Sanborn Corp.)*, 813 F.2d 1177, 1181 (11th Cir. 1987) ("holding that "any funds under the control of the debtor, regardless of their source, are properly deemed to be the debtor's property.").

IFS, through the Advisory Board and Hugo Pimienta, controlled the Southwest Bank of Texas account.  IFS had the ability and did in fact use the Southwest Bank of Texas account to deposit its own revenues and to pay its own creditors.  Based on the evidence presented and the precedent cited above, the Court finds that the entire Southwest Bank of Texas account was "an interest of the debtor," IFS.

### 2. Actual Intent to Hinder, Delay, or Defraud

Trustee Smith contends that the disputed transfers are avoidable under §§ 24.005(a)(1), (a)(2) and § 24.006 of the Texas Uniform Fraudulent Transfer Act ("TUFTA").

Section 24.005(a)(1) of the Texas Business and Commerce Code defines a fraudulent transfer to include a transfer made with actual intent to hinder, delay, or defraud a creditor:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>> (1) with the ***actual intent*** to hinder, delay, or defraud any creditor of the debtor;

TEX. BUS. & COMMERCE CODE § 24.005(a)(1).

20

The statute focuses on the intent of the transferor rather than the transferee. *Sec. & Exch. Comm'n v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007) ("'[T]he transferees' knowing participation is irrelevant under the statute for purposes of establishing the premise (as opposed to liability for) a fraudulent transfer.") (citing *Warfield v. Byron*, 436 F.3d 551, 559 (5th Cir. 2006)).

Direct proof of actual intent "will rarely be available." *In re Agric. Research & Tech. Group, Inc.*, 916 F.2d 528, 534–35 (9th Cir. 1990) (quoting *In re Roco Corp.*, 701 F.2d 978, 984 (1st Cir. 1983)).  Courts often must instead rely on "circumstantial evidence." *Id*. Evidence of a fraudulent scheme is sufficient circumstantial evidence to establish actual intent with respect to transfers made in furtherance of the fraudulent scheme. *Res. Dev. Int'l, LLC*, 487 F.3d at 301; *Warfield*, 436 F.3d 551 at 558.

The Fifth Circuit and other circuits have repeatedly held that the existence of a fraudulent scheme itself is sufficient to find that a transfer made in furtherance of that scheme was made with fraudulent intent. *Sec. & Exch. Comm'n*, 487 F.3d at 301 ("In this circuit, proving that IERC operated as a Ponzi scheme establishes the fraudulent intent behind the transfers it made."); *Warfield*, 436 F.3d at 558 ("The Receiver's proof that RDI operated as a Ponzi Scheme established the fraudulent intent behind transfers made by RDI."). *See also In re Agric. Research & Tech. Group, Inc.*, 916 F.2d at 535–36 ("[T]he debtor's actual intent to hinder, delay or defraud its creditors may be inferred from the mere existence of a Ponzi scheme."); *Conroy v. Schott*, 363 F.2d 90, 92 (6th Cir. 1966). *See also Floyd v. Dunson (In re Rodriguez)*, 209 B.R. 424, 433 (Bankr. S.D. Tex. 1997). Indeed, in a fraudulent scheme, all transfers made in furtherance of the fraudulent scheme are inherently made with fraudulent intent.  Once an entity is no longer paying investors through legitimate revenues, then transfers to prior investors are

fraudulent if made with the intent of keeping the fraudulent organization going.   If the organization is a Ponzi scheme, the organization is a fraud and any transfer made to continue the fraud is made with an actual intent to defraud.[15]

The Supreme Court's *Dean v. Davis* opinion also held that knowingly making a transfer that constitutes a fraudulent act is sufficient to find actual intent to defraud creditors. *Dean v. Davis*, 242 U.S. 438, 37 S. Ct. 130, 61 L. Ed. 419 (U.S. 1917). In *Davis,* Jones feared arrest if he did not pay notes owed to a bank. *Id.* at 442. To avoid arrest, Jones arranged a loan from his brother-in-law, Dean. *Id.* In return for the loan, Jones granted Dean a mortgage on all his real and personal property. *Id.* Jones used the loan proceeds to pay the bank. *Id.* The bankruptcy trustee brought suit against Dean to avoid the mortgage. *Id.* at 443.

The Supreme Court held that the transfer of the mortgage was a fraudulent transfer. *Id.* at 444.  The fact that the mortgage was made to pay an existing creditor did not affect the Court's analysis. *Id.* The Court held that a transfer that enables the defendant to commit a fraudulent act constitutes a fraudulent transfer. *Id.* ("But where the advance is made to enable the debtor to make a preferential payment with bankruptcy in contemplation, the transaction presents an element upon which fraud may be predicated."). In this case, the fraudulent act was the preferential payment to the bank.  The Supreme Court noted that the circumstances surrounding the transfer itself establishes the required fraudulent intent. *Id.* Where the "obviously necessary effect" of a transfer "is to deprive creditors of the benefits sought to be secured by the

---

[15] Though the Fifth Circuit cases considered fraudulent organizations deemed "Ponzi schemes," this Court makes no findings regarding when and if the Interamericas Companies became a Ponzi scheme.  The Fifth Circuit's reasoning applies whether the organization neatly fits within a judicially constructed definition of Ponzi scheme or was a fraudulent scheme that had some, but perhaps not all, attributes of the traditional Ponzi scheme.  When an organization perpetuating a fraud makes a transfer necessary for continuation of the fraud, the transfer is made with actual intent to defraud.

Bankruptcy Act," the transfer is made with the required intent to hinder, delay, or defraud creditors. *Id*.

It is questionable whether the Advisory Board ever reasonably believed that it could honor its promises to investors through revenues generated by Interamericas Companies entities rather than funds solicited from new investors. The high interest rates promised and the promoter commission structure are hallmarks of a classic Ponzi scheme. Investors were promised double-digit returns and their accounts showed consistent double-digit rates paid year over year. The commissions gave promoters an incentive to discourage investors from requesting withdrawals. Promoters were paid a monthly commission based on total investments retained with the Interamericas Companies.

The Court finds that, at the very least, by late 1997 and early 1998, Hugo Pimienta was operating a fraudulent scheme. Testimony and other evidence showed that Hugo Pimienta decided to sell AFL and Accubanc somewhere between late 1997 and early 1998 in response to obligations owed to Blitz.[16] Once Hugo Pimienta decided upon that course of action, Hugo Pimienta could no longer have believed that the companies could produce profits sufficient to cover their obligations to investors. By that point, the Interamericas Companies owed well over $100 million without any significant assets. Rather than paying current investors ratably, Hugo Pimienta continued to solicit new investments, issued fraudulent loans to distort balance sheets, and paid off favored investors and insiders with new investments.

Though the Interamericas family of entities also held a few operating entities, there is no evidence that they generated substantial profits. Most were also sold during the same period. There was evidence that Hugo Pimienta transferred significant amounts to capitalize a new

---

[16] AFL and Accubanc were actually sold in late 1999–2000. However, Hugo Pimienta and Luis de la Pena both testified that the decision to sell the entities was made in 1998, following the separation with Blitz.

venture, Pueblo Corporation.  However, the evidence suggested that Pueblo Corporation was never a profitable entity and was wholly dependent upon capitalization from investor funds. Ultimately, Pueblo Corporation was sold to insiders and investors for $1 million in promissory notes that were never paid.

Accordingly, at least by 1998, the Court finds that IFS and the rest of the Interamericas Companies entities were operating a fraudulent scheme.  The fact that the scheme may have contained some revenue-generating businesses is not sufficient to defeat a finding of fraudulent intent where the revenue-generating businesses could not have reasonably been expected to fund the operations. *In re Agric. Research & Tech. Group, Inc.*, 916 F.2d at 531, 535–36 (holding that a multi-entity organization that solicited investments for the production and sale of plants constituted a fraudulent scheme though the organization did in fact produce and sell plants); *Conroy*, 363 F.2d at 92 (holding that the fact that the defendant had a law practice was not sufficient to defeat a fraudulent intent finding where the defendant could "not reasonably expect to repay loans extending into the millions" from the practice).[17]

### 3. Avoidable by an Unsecured Creditor

Section 544(b) requires the Trustee to establish that a creditor within whose shoes he steps, could have brought the state law fraudulent transfer action. 11 U.S.C. § 544(b); *In re DLC, Ltd.*, 295 B.R. 593, 602 (B.A.P. 8th Cir. 2003); *In re G-I Holdings, Inc.*, 313 B.R. 612, 632–33 (Bankr. D. N.J. 2004).

Defendants did not seriously allege that no IFS creditor could have filed a fraudulent transfer cause of action.  IFS's schedules list numerous creditors, including Blitz and investors.

---

[17] Defendants' post-trial briefing also alleged that Trustee Smith did not produce evidence of wire-transfers, bank statements, etc. showing that Defendants received the transfers at issue.  However, witnesses admitted that they received transfers.  Defendants' expert report also lists the disputed transfers.

Blitz and individuals who invested with Interamericas Companies in the same manner as Defendants could have brought fraudulent transfer claims.

### 4. Summary of § 24.005(a)(1) Elements

For the reasons set forth above, the Court finds that Trustee Smith has meet his burden with respect to his claims pursuant to § 544 of the Bankruptcy Code and § 24.005(a)(1) of TUFTA. Trustee Smith has shown that IFS made transfers of IFS property with the actual intent to hinder, delay, or defraud creditors and IFS has creditors that could have brought Trustee Smith's claims.

## Section 24.009(a) Defense

Once the plaintiff has met his burden on the elements of a fraudulent transfer, the defendant bears the burden of establishing an applicable defense. *Quilling v. Gilliland*, 2002 WL 373560, at *3 (N.D. Tex. March 6, 2002); *In re Agric. Research & Tech. Group*, 916 F.2d at 535.

To establish an affirmative defense to § 24.005(a)(1), Defendants must produce evidence of two elements: (1) reasonably equivalent value; and (2) good faith. Section 24.009(a) provides:

> A transfer or obligation is not voidable under Section 24.005(a)(1) of this code against a person who took in ***good faith*** and for a ***reasonably equivalent value*** or against any subsequent transferee or obligee.

TEX. BUS. & COMMERCE CODE § 24.009(a) (emphasis added). The Court considers the two elements separately below.

### 1. Reasonably Equivalent Value

Payment on a debt owed to the transferee is considered "value" for purposes of § 24.009. Section 24.004(a) specifically provides that "value" includes satisfaction of an antecedent debt.

TEX. BUS. & COMMERCE CODE § 24.004(a).[18]  A debtor may also receive "reasonably equivalent value" when the debtor's payment of a third-party's debt reduces the debtor's liabilities. *In re Newtowne, Inc.*, 157 B.R. 374, 379 (Bankr. S.D. Ohio 1993); *In re Uiterwyk Corp.*, 75 B.R. 33, 34 (Bankr. M.D. Fla. 1987); *In re Gerdes*, 246 B.R. 311, 314–15 (Bankr. S.D. Ohio 2000). Courts must consider all aspects of a transaction and both direct and indirect burdens to the debtor when determining value. *In re Newtowne, Inc.*, 157 B.R. at 378–79.  The salient issue is whether the estate lost value. *Nat'l Loan Investors, L.P. v. Robinson*, 98 S.W. 3d 781, 784 (Tex. Ct. App.—Amarillo 2003, pet. denied); *In re Prejean*, 994 F.2d 706, 708–09 (9th Cir. 1993)). The value of the transfer is determined at the date of the transfer. *Jimmy Swaggart Ministries v. Hayes (In re Hanover)*, 310 F.3d 796, 802–03 (5th Cir. 2002).

Trustee Smith contends that Integra Bank, not IFS, owed the debt to Defendants so that IFS received no value in return for payments from IFS's Southwest Bank of Texas account.  The Court need not decide who, if anyone, primarily owed the Defendants for their investments in Integra Bank.  The evidence demonstrated a fraudulent scheme and defendants were victims of a fraud perpetrated, in part, by IFS.  IFS is liable for the consequences of its fraud.  Payments to defendants would have reduced investors' damages and IFS's liability for the fraud.  From the creditor's standpoint, the estate did not lose value.  The estate's liabilities were reduced in the same amount as the transfer.  The Court finds that IFS did receive reasonably equivalent value from the disputed transfers in that its liability for fraud was reduced in the amount of the

---

[18] Section 24.004(a) provides:

> Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise made otherwise than in the ordinary course of the promissor's business to furnish support to the debtor or another person.

TEX. BUS. & COMMERCE CODE § 24.004(a).

transfers.

Accordingly, the Court finds that Defendants have met their burden for the first element of § 24.009(a)'s defense: receipt of reasonably equivalent value.

The Court next considers whether Defendants met their burden with respect to the second element of the § 24.009(a) defense: good faith.

### 2. Good Faith

Courts apply an objective standard for determining "good faith." *Warfield*, 436 F.3d at 559–60 (citing *In re Agric. Research & Tech. Group, Inc.*, 916 F.2d at 535–36; *In re Sherman*, 67 F.3d 1348, 1355 (8th Cir. 1995)). Under the objective standard, Defendants must show that their knowledge of particular facts was not such that they "should have known" of the fraudulent scheme. *Id*; *In re Sherman*, 67 F.3d at 1355 ("To determine whether a transferee acts in good faith, 'courts look to what the transferee objectively "knew or should have known"' instead of examining the transferee's actual knowledge from a subjective standpoint.") (quoting *In re Agric. Research & Tech. Group*, 916 F.2d at 535). *See also Shauer v. Alterton*, 151 U.S. 607, 621, 14 S. Ct. 442, 446, 38 L. Ed. 286 (1984)). The Fifth Circuit has implied that knowledge of the debtor's insolvency at the time the transfer was received may be sufficient to preclude a finding of "good faith." *In re Hannover Corp.*, 310 F.3d at 799–801.

The Court considers each Defendants' good faith separately below.

### a. Luis de la Pena

Trustee Smith seeks recovery from Luis de la Pena of five transfers made between December of 1999 and March of 2001, totaling $251,950.00.

Luis de la Pena had extensive knowledge of the Interamericas Companies and Integra Bank's operations that should have led him to the conclusion that he was investing in a

fraudulent scheme.  Luis de la Pena was not simply a passive investor.  He knew that Integra Bank was not a true bank and that the security of his investments depended on the operations of the Interamericas Companies.  He sat on the Interamericas Companies Advisory Board from 1993–1998 and attended nearly 10 meetings a year in that capacity.   Luis de la Pena testified that Board members discussed the Interamericas Companies' business operations in great detail. He visited the Integra Bank offices and saw that it lacked the attributes of a true bank.  He testified that Integra Bank's physical location appeared to be nothing more than rented office space lacking the infrastructure one expects in a true bank.

Before leaving for a two year stay in Germany in late 1998, Luis de la Pena attended a board meeting where the Blitz dispute was discussed.  Luis de la Pena knew that Blitz wanted to separate from the Interamericas Companies group and was demanding significant sums to effectuate the separation.  Luis de la Pena also testified that he felt more secure about his investments after Blitz joined Interamericas Companies because the Blitz group brought in over $50 million in investment contributions.  The corollary of this belief is that news of Blitz's departure should have shaken his sense of security.  Luis de la Pena also admitted that he knew that the Advisory Board would have to raise significant sums to satisfy Blitz, and that the only way to do this was through the sale of AFL and Accubanc, the IFS's only significant revenue-generating entities.   A reasonable person would seriously question the soundness of his investments in an organization when the organization is forced to sell its only means of revenue-generation.

Luis de la Pena knew (or with open eyes would have known) that the Advisory Board was committing fraud.  The Advisory Board asked him to execute a $3 million promissory note to AFL in June of 1998.  Luis de la Pena was told that the note was being issued to resolve short-

term problems Interamericas Companies were having and that he would not have to pay the note. The loan documents also purported to pledge stock in Luis de la Pena's name that he did not recall purchasing. A reasonable person would seriously question the legitimacy of an enterprise that asks an investor to execute sham loan documents and pledges stock that he did not purchase but that is nevertheless in his name.

Luis de la Pena's Integra accounts also, at the very least, should have led him to the conclusion that the Advisory Board was not running a legitimate enterprise. Luis de la Pena testified that he only purchased CDs from Integra Bank. His early Integra accounts reflected the CDs. However, later accounts showed a conversion of the CDs into bearer notes issued by Interamericas Companies entities. Luis de la Pena never approved the conversion. Knowledge of unapproved conversions of one's investments from CDs to bearer notes would lead a reasonable person to seriously question the legitimacy of the enterprise holding the investments.

For all the above reasons, the Court finds that Luis de la Pena knew (or at the very least, should have known) that the Advisory Board was orchestrating a fraud by December of 1999. Luis de la Pena is not entitled to § 24.009(a)'s defense.

### b. Margarita Isabel, Maria Cristina, and Maria Paz de la Pena Stettner

Trustee Smith seeks recovery of multiple transfers made to Margarita Isabel, Maria Cristina, and Maria Paz de la Pena Stettner between January and August of 2000, totaling $1,123,467.60. The de la Pena Stettners are sisters of Luis de la Pena. The transfers appeared to have been made for an account the sisters inherited from their father.

The evidence overwhelmingly supports a finding that Luis de la Pena managed the accounts on his sisters' behalf. Luis de la Pena and Margarita de la Pena Stettner testified that Margarita Isabel de la Pena Stettner did contact Ramon Beteta directly on at least one occasion.

However, Hugo Pimienta, Luis de la Pena, Margarita Isabel de la Pena Stettner, and Maria Paz de la Pena Stettner all testified that Luis de la Pena managed the accounts on his sisters' behalf. Luis de la Pena received their account statements and contacted Hugo Pimienta regarding his sisters' account. When asked about amounts withdrawn, how withdrawals were executed, how withdrawals were distributed to the sisters, and where withdrawals went, Margarita Isabel de la Pena Stettner and Maria Paz de la Pena Stettner pled complete ignorance. The Court can only infer from this ignorance that, as Hugo Pimienta, Luis de la Pena, and the de la Pena sisters testified, Luis de la Pena managed their account on their behalf.

Based on Luis de la Pena's control over his sisters' account, the Court finds that Luis de la Pena was his sisters' agent for the purposes of the account. "Under Texas Law, agency is a legal relationship created by the express or implied agreement between the parties, or by operation of law, under which the agent is authorized to act for and on behalf of the principal, and subject to the principal's control." *Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc.*, 630 F.2d 250, 269 (5th Cir. 1980). A leading authority on agency has described a principal-agent relationship as follows:

> There is no particular mode or method which must be adhered to in order to create or establish agency. Regardless of the terms used by the parties, or by what name the transaction is designated, if the facts fairly disclose that one party is acting for or representing another, by the latter's authority the agency exists.

WILLISTON ON CONTRACTS, §35:1 (4th ed. 1999) (citing RESTATEMENT (SECOND) OF AGENCY § 15, (2nd ed. 1958)); *Smith v. Matias (In re IFS Financial Corp.)*, 2008 WL 2778845, at *13 (Bankr. S.D. Tex. Sept. 11, 2007).

An agent's knowledge is imputed to the principal. *Peel v. Am. Fid. Assurance Co.*, 680 F.2d 374, 377 (5th Cir. 1982) ("If the MEA was Mrs. Peel's agent when it renegotiated policy coverage, knowledge of the change in coverage was imputed to her as principal.") (citing

RESTATEMENT (SECOND) OF AGENCY § 9(3), 268(1)(c) (1958)); *La Sara Gavin Co. v. First Nat. Bank of Mercedes*, 673 S.W.2d 558, 563 (Tex. 1984). The Second Restatement of Agency provides:

> A person has notice of a fact if his agent has knowledge of the fact, reason to know it or should know it, or has been given a notification of it, under circumstances coming within rules applying to the liability of a principal because of notice to his agent.

RESTATEMENT (SECOND) OF AGENCY § 9(3), 268(1)(c) (1958).

Accordingly, the Court finds that Margarita Isabel, Maria Cristina, and Maria Paz de la Pena Stettner "should have known" that the Advisory Board was involved in fraudulent activity before January of 2000. Margarita Isabel, Maria Cristina, and Maria Paz de la Pena Stettner are not entitled to § 24.009(a)'s defense.

### c. Guillermo de la Pena Stettner

Trustee Smith seeks recovery of five separate transfers made to Guillermo de la Pena Stettner, received between January 12, 2000 and September 25, 2000, totaling $188,240.00.

The Court finds that Luis de la Pena also served as Guillermo de la Pena's agent with respect to Guillermo de la Pena's Integra account. Guillermo de la Pena is Luis de la Pena's brother. Luis de la Pena testified that he managed the accounts of all of his family members. Guillermo de la Pena testified that Luis de la Pena controlled his account. Guillermo de la Pena testified that statements were delivered to Luis de la Pena and he made investments through Luis de la Pena. Based on the testimony presented, the Court finds that Luis de la Pena served as Guillermo de la Pena's agent with respect to Guillermo de la Pena's Integra Bank account and imputes Luis de la Pena's knowledge to Guillermo de la Pena. Accordingly, the Court finds that Guillermo de la Pena "should have known" that the Advisory Board was involved in fraudulent activity before January of 2000. Guillermo de la Pena is not entitled to § 24.009(a)'s defense.

### d. Woodberry #2

Trustee Smith seeks recovery of one transfer made to Woodberry #2, received in December of 1999.

Woodberry #2 was a shell company set up on behalf of Juergen Ulrich.  Juergen Ulrich is the brother of former Advisory Board member Peter Ulrich.  Juergen Ulrich did not invest in his own name but instead used the Woodberry #2 shell.  Juergen Ulrich did not report his Interamericas Companies investments to the Mexican taxing authorities.  These facts may be evidence of an intent to violate tax law, but, alone, do not support a finding that Juergen Ulrich knew that Interamericas Companies was engaged in fraudulent activity in December of 1999. The evidence demonstrated that Juergen Ulrich had no such knowledge.  Juergen Ulrich testified that he had no reason to question the legitimacy or security of his investments prior to 2001. Besides the single withdrawal in 1999, Juergen Ulrich made no further attempts to withdraw the nearly $1 million he had invested with Interamericas Companies.  Juergen Ulrich did not attempt to redeem his investments until 2001.  It would be unreasonable to assume that Juergen Ulrich knew that the Interamericas Companies were engaged in a Ponzi-like scheme in 1999 but nevertheless waited two years to demand a redemption.  Based on Juergen Ulrich's testimony, the Court finds that Woodberry #2 received the challenged transfers in good faith.

Accordingly, the Court finds that Woodberry #2, through Juergen Urlich, received the December, 1999 withdrawal in "good faith."

### e. Ramon Garcia Suarez

Trustee Smith seeks recovery of two transfer made to Ramon Garcia Suarez in May of 2000, totaling $468,293.75.

The evidence demonstrated that Ramon Garcia Suarez obtained the withdrawals in "good

faith."  There is no evidence that Ramon Garcia Suarez was an insider or otherwise had any inside knowledge as to the operations of the Interamericas Companies.  There is no significant evidence suggesting that Ramon Garcia Suarez had reason to question the legitimacy of his investments.  Ramon Garcia Suarez made significant deposits just months before May of 2000 and after May of 2000.  Between November of 1999 and August of 2001, Ramon Garcia Suarez deposited over $700,000.00.  Ramon Garcia Suarez's deposits of massive amounts during the same time period as the disputed transfers is strong evidence that he had no reason to believe that the Interamericas Companies were insolvent or orchestrating a fraudulent scheme.  Accordingly, the Court finds that Ramon Garcia Suarez received the disputed transfers in "good faith."

### f. Mario Valverde Garces

Trustee Smith seeks recovery of six transfers made to Mario Valverde Garces between April of 2000 and August 6 of 2001, totaling $85,600.00.

Mario Valverde Garces became a promoter for the Interamericas Companies in the early 1990s.  As a promoter, he was paid between 0.10 to 1.00 % per month of the total investments held by investors he solicited.  Mario Valverde Garces also opened an account in his wife's name.  The investments were to pay an approximately 10-11% rate of return.  The evidence suggests that the account was effectively a shared account.  Mario Valverde Garce's commissions were paid into the account in the form of Integra CDs or Interamericas Companies bearer notes.  Mario Valverde Garces made all communications to Interamericas Companies regarding the account and managed the account.

The evidence demonstrated that Mario Valverde Garces received almost all the disputed transfers in good faith.  Mario Valverde Garces testified that he had no reason to question the legitimacy or safety of the investments prior to receipt of the disputed transfers.  The commission

pay structure and approximately 10-11% rate of return on the CDs and bearer notes were not so extraordinary that the commissions and interest rate alone should have caused Mario Valverde Garces to conclude that the Interamericas Companies were orchestrating a fraudulent scheme.

Moreover, Mario Valverde Garces testified that he had a reason to believe in the legitimacy of the Interamericas Companies and their ability to lawfully pay the commissions and investment rates of return.  Mario Valverde Garces did not invest his money without inquiring into the nature of the investments.  Rather, Mario Valverde Garces testified that he inquired about the Interamericas Companies operations and Peter Ulrich explained how the investments were managed in the Woodlands and how the "synergies" of various companies produced the profits.  Mario Valverde Garces testified that he found Ulrich's explanations very persuasive. Although he may have been naïve, given his overall background and the credibility of his testimony, the Court does not find that Mario Valverde Garces "should have known" of the fraud.  Accordingly, the Court finds that the bulk of the transfers made to him were made in good faith.

Mario Valverde Garces admitted that, by August 1, 2001, he did know that the Interamericas Companies were operating a fraudulent scheme.  Accordingly, the Court finds that Mario Valverde Garces received all the transfers, except for the August 6, 2001 transfer of $2,000.00, in good faith.  The Court will award Judgment in the amount of $2,000.00 against Mario Valverde Garces and in favor of the IFS estate.

### Summary of Defenses

Ramon Garcia Suarez, Woodberry #2 and Mario Vavlerde Garces established that they took the disputed transfers in good faith and for reasonably equivalent value.  With the exception of the August 6, 2001 transfer to Mario Valverde Garces, the Court dismisses Trustee Smith's

claims against Ramon Garcia Suarez, Woodberry #2, and Mario Vavlerde Garces based on § 24.009(a) of the Texas Business and Commerce Code.

### Select Asset Loan Payments

Trustee Smith also seeks recovery of payments IFS allegedly made on a $3 million promissory note issued from AFL to Luis de la Pena. From April of 1999 to December of 2000, IFS allegedly paid over $800,000.00 on the note.

As discussed earlier, the AFL note was not a true note. Luis de la Pena testified that he never received any actual proceeds from the note. The purpose of the note was to fraudulently reallocate assets and liabilities among the Interamericas Companies entities to meet financial ratio requirements imposed by Blitz, while creating false entries on AFL's books for the purpose of misleading insurance regulators. Other than a credit on an account statement issued by Interamericas Companies, Trustee Smith produced no evidence that Luis de la Pena ever received actual proceeds from the note. Luis de la Pena never withdrew the amount credited to his account. Trustee Smith produced no evidence that Luis de la Pena received anything of value pertaining to the note. Luis de la Pena and Hugo Pimienta both testified that IFS actually received the note proceeds.

Based on the evidence presented, the Court finds that Luis de la Pena did not receive an interest of IFS when he fraudulently executed the AFL note. If anyone received an interest from the AFL note, it was IFS. The Court dismisses Trustee Smith's fraudulent transfer claim against Luis de la Pena with respect to the AFL note.

Trustee Smith's amended complaint also alleged that Luis de la Pena was liable to the IFS estate for a $5 million note and dividend payments made to IFS stockholders. Trustee Smith produced no evidence of the nature of alleged debt or Luis de la Pena's receipt of any proceeds

35

on account of the alleged note and dividend payments.  The Court dismisses Trustee Smith's claims against Luis de la Pena based on the alleged debt and dividends.

### Section 24.011 of the Texas Business and Commerce Code

Section 24.011 provides that "principles of law and equity" supplement TUFTA. TEX. BUS. & COMMERCE CODE § 24.011.[19] Defendants contend that allowing recovery against Defendants would be inequitable because individuals and entities most responsible for Interamericas Companies' demise will benefit the most from the recovery.  Defendants correctly note that Blitz is IFS's largest creditor.  Defendants contend that Blitz triggered the Interamericas Companies' fall when it broke away from Interamericas Companies and demanded tens of millions that the Interamericas Companies could not pay.  Defendant's also note that, pursuant to a settlement agreement between Trustee Smith and Hugo Pimienta, Hugo Pimienta will get credit against a judgment Trustee Smith obtained against him.

The Court does not read § 24.011 to allow the Court to elevate the Court's own judgment regarding equity above the Texas State Legislature's, embodied by the plain-language of the statute.  Section 24.011 is analogous to § 105, the provision under the Bankruptcy Code granting bankruptcy courts equitable powers. 11 U.S.C. § 105.[20]  The Supreme Court and Fifth Circuit have clarified that Courts cannot use § 105 to create new rights or ignore existing rights. *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206, 108 S. Ct. 963, 99 L. Ed. 2d 169 (1988); *In re Southmark Corp.*, 49 F.3d at 1116. Section 105 is better read as authority to fill gaps Congress

---

[19] Section 24.011 provides: "Unless displaced by the provisions of this chapter, the principles of law and equity, including the law merchant and the law relating to principal and agent, estoppel, laches, fraud, misrepresentation, duress, coercion, mistake, insolvency, or other validating or invalidating cause, supplement its provisions." TEX. BUS. & COMMERCE CODE § 24.011.

[20] Section 105(a) provides: "The Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.  No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process." 11 U.S.C. § 105(a).

36

left unanswered so that the Rules and Code operate consistent with their purposes. *Rodriguez v. Countrywide Home Loans, Inc. (In re Rodriguez)*, 396 B.R. 436, 460 (Bankr. S.D. Tex. 2008). Where the language is plain and there are no gaps, § 105 does not allow courts to vary the substance of the Code. *Id*. at 459–60.

The Court reads nothing in § 24.011 suggesting it should be interpreted differently from § 105. Defendants have cited and the Court has found no cases holding that § 24.011 gives courts the authority to ignore the application of other TUFTA provisions. Section 24.011's plain language provides that the Court should consider equitable principles only to the extent other provisions of TUFTA do not apply. TEX. BUS. & COMMERCE CODE § 24.011 (stating that equitable principles should be applied "*[u]nless* displaced by the provisions of this chapter") (emphasis added).

This adversary proceeding has challenged the Court with a complex factual and procedural history. However, the application of the facts to the elements of § 24.005 and 24.009 is without ambiguity. Trustee Smith has established the elements of a § 24.005(a)(1) fraudulent transfer the State Legislature required. Defendants against whom judgments will be entered failed to establish the elements of the § 24.009(a) defense the State Legislature required. Section 24.011 is not an encouragement to ignore the State Legislature's mandate and rewrite the fraudulent transfer provisions in a manner that substitutes the State Legislature's judgment with the Court's. Accordingly, the Court finds that § 24.011 has no material affect on the outcome of this case.

In the alternative, the Court finds that Trustee Smith's recoveries would not lead to inequitable results. With respect to Blitz, the Court notes that Blitz is not recovering the disputed funds; Trustee Smith is. Whether Blitz is an ultimate distributee of some of the recovered funds

is an issue left for another day under the equitable distribution provisions of the Bankruptcy Code. The Court notes that Trustee Smith has previously failed to obtain equitable subordination of Blitz's claim. The prior failure may indicate a probability that Blitz will receive a distribution from the estate. But, the Blitz distribution should be made in accordance with the amount required by Congress. The Court will not make such a decision in the context of an adversary proceeding to which Blitz is not a participant.

With respect to Hugo Pimienta, the Court notes that Hugo Pimienta's alleged benefit from Trustee Smith's recoveries will only occur if the recoveries are "obtained as a result of the assistance of Pimienta" (docket no. 435-2, case no. 02-39553). Hugo Pimienta will not be paid merely because Trustee Smith makes a recovery. The settlement agreement was previously approved by the Court after notice and hearing. It would be inequitable not to enforce the Court's prior order.

### 24.005(a)(2) and 24.006

An essential element of 24.005(a)(2) and 24.006(a) is that the transferor did not receive reasonably equivalent value. TEX. BUS. & COMMERCE CODE § 24.005(a)(2).[21] As discussed earlier, IFS received reasonably equivalent value for the disputed transfers from IFS's Southwest

---

[21] 24.005(a)(2) provides:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
(A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
(B) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

TEX. BUS. & COMMERCE CODE § 24.00(5)(a).

Bank of Texas account.  Accordingly, the Court dismisses Trustee Smith's claims based on 24.005(a)(2) and 24.006(a).

## Conclusion

For the reasons set forth above, the Court awards Trustee Smith judgments as follows:

▪ $188,240.00 against Guillermo de la Pena Stettner;

▪ $251,950.00 against Luis de la Pena;

▪ $375,213.27 against Margarita Isabel de la Pena Stettner;

▪ $354,127.17 against Maria Cristina de la Pena Stettner;

▪ $394,127.16 against Maria Paz de la Pena Stettner; and

▪ $2,000.00 against Mario Valverde Garces.

Separate judgments will be issued.  The Court dismisses the remainder of Trustee Smith's claims.

SIGNED **September 9, 2009.**

_____
Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE